GIGAX, Appellant and Cross–Appellee,

v.

REPKA et al., Appellees and Cross–Appellants.

[Cite as *Gigax v. Repka* (1992), 83 Ohio App.3d 615.]

Court of Appeals of Ohio,
Montgomery County.

No. 13386.

Decided Nov. 12, 1992.

*A. Mark Segreti, Jr.*, for appellant and cross-appellee.

*James M. Hill*, for appellees and cross-appellants.

---

BROGAN, Judge.

Robert E. Gigax appeals the judgment of the Montgomery County Court of Common Pleas denying his request for a preliminary injunction to preclude the appellees, Melvin J. Repka et al., from terminating his employment with Miami Valley Contractors, Inc., and to require the appellees to protect his financial interests in Miami Valley Contractors Inc.

Gigax advances five assignments of error, asserting that the trial court erred (1) in holding and declaring that Gigax, a minority shareholder and director in a close corporation, is an employee at will; (2) by failing to declare that the heightened fiduciary duties owed by the majority shareholders to the minority shareholders in this close corporation precluded the termination of the minority shareholder's employment with the corporation and/or removal as an officer; (3) by abusing its discretion in failing to enjoin the termination of plaintiff's employment by the majority shareholders in this close corporation; (4) by abusing its discretion in failing to enjoin the removal of plaintiff as an officer by the majority shareholders in this close corporation, and (5) in holding and declaring that Gigax is an employee and not an employer. Due to their substantial similarity, and in the interest of judicial economy, some of these assignments of error will be considered together.

The appellees filed a cross-appeal, asserting that the trial court erred in ordering them to pay Gigax compensation for ninety days after his termination.

The facts of this case are as follows. In 1978, Gigax, Repka, Lensch, Holmes, Manning and their wives formed a close corporation called Miami Valley Contractors, Inc. ("MVC"). The business primarily involved contracting with local governments for sewage treatment systems and water treatment plants in Ohio and the surrounding states. Each principal initially invested $25,000. MVC was incorporated in Delaware and its principal place of business is in Vandalia, Ohio. Ownership of the stock, which is not sold on a securities market, was divided equally among the five couples. At the time the parties formed MVC, the plan was that each principal would work for MVC in addition to owning stock until MVC was sold or phased out to provide a retirement fund. Shortly after its

formation, Holmes and Manning left the company and sold their shares to MVC. In 1991, the three remaining partners each loaned the corporation an additional $45,000.

Gigax, Repka, and Lensch also formed a partnership, MVC Leasing. MVC Leasing owns the real estate where MVC operates its business, as well as some of the equipment utilized by the corporation.

Repka, Gigax, and Lensch were directors of MVC and also worked as employees; they all earned the same salary. Gigax, a civil engineer, was a project manager; Lensch was an estimator/project manager; and Repka utilized his accounting background. However, no employment agreement was entered into by the parties, although they did have a buy-out agreement applicable upon the death of any one of them. Gigax also served as president for various terms totalling six years, vice-president of operations, and was secretary at the time of his termination. Repka has been president of MVC since 1988. In February or March 1992, Repka and Lensch met and decided to terminate Gigax's employment with MVC allegedly due to his poor record of performance since 1989. Repka asserted that as president, he had the authority to terminate Gigax's employment with MVC.

In mid-February, Gigax was given an ultimatum to quit or his employment would be terminated. Additionally, he was removed from his position as secretary and his check writing privileges were revoked. In April, Repka and Lensch had the office locks changed to prevent Gigax from entering the premises. Gigax was offered the opportunity to sell out to Repka and Lensch; however, the parties were unable to reach an agreement and the offer was subsequently withdrawn. Specifically, Repka alleged that although Gigax had been a profitable contributor to MVC prior to 1989, since then his profitability margin had substantially declined, and legal and public relations problems frequently arose out of his jobs. Repka stated that with respect to the profitability problems, he was referring primarily to the "Athens" job currently in arbitration, but that no other jobs had gone to either arbitration or litigation, allegedly due to the settlement of any problems through negotiations. He also stated that there was some question as to who was responsible for the problems on that project. Repka and Lensch both admitted that none of these concerns was ever discussed with Gigax. With respect to the public relations problems, Repka further admitted that none of the problems with delinquent bills could be attributed to Gigax's conduct and that delays on jobs of this nature are not unusual. The testimony of Michael Perry, who worked with Gigax several times, stated that his "experience [working with Gigax] wasn't great because the company has a bonus plan, and when I work with Bob, I never got in on a bonus plan." Kevin Triplett, a project engineer who worked with Gigax, stated that the projects on which they

had worked together were unsuccessful due to delays, but that he was capable of handling those matters. Evidence was also presented that both Repka and Lensch also experienced declines in profitability on their projects at various times since 1978.

Gigax adamantly contests the aforementioned allegations and claims that Repka and Lensch are attempting to freeze him out of MVC and deprive him of his investment.

On April 1, 1992, Gigax filed a complaint seeking a declaratory judgment, injunctive relief, and monetary damages arising from his termination as an employee of MVC. Gigax also filed a motion for a temporary restraining order, which the trial court denied, and a motion for a preliminary injunction. On April 6 and 7, 1992, an evidentiary hearing was held on Gigax's motion for a preliminary injunction. The trial court's decision was rendered on April 10, 1992, wherein the court denied Gigax's request that the appellees be enjoined from terminating the "at-will" employment of Gigax, but required the appellees to continue Gigax's salary for ninety days after termination and enjoined them from taking any corporate action which would deprive Gigax of the other benefits of his investment. The court also ordered MVC to take "immediate steps to evaluate and negotiate the purchase of Gigax's interest in MVC and report to the court the status of the same within thirty days of the date of the order." Gigax filed an appeal from this decision on April 15, 1992. On April 20, 1992, the defendants filed a cross-appeal. Their motion to stay the April 10, 1992 decision was granted by the trial court.

In his first, second, third, and fourth assignments of error, Gigax asserts that the trial court erred in holding that a minority shareholder and director in a close corporation is an employee at will and in failing to enjoin his termination and removal as an officer by the majority shareholders. These issues must be considered in conjunction with the issue in Gigax's second assignment of error, that the trial court erred by failing to declare that the heightened fiduciary duties owed by the majority shareholders to the minority shareholders in the close corporation precluded the termination of Gigax's employment and/or removal as an officer. Thus, the issue is whether in the absence of an agreement for employment for a specific duration, the employment of an shareholder/director of a close corporation can be terminated "at will."

In Ohio, the doctrine of employment at will is generally defined as follows:

" * * * a contract for permanent employment, for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and a discharge

without cause does not constitute a breach of such contract justifying recovery of damages.'" *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 102, 19 OBR 261, 262, 483 N.E.2d 150, 152, fn. 1, quoting *Henkel v. Educational Research Council of Am.* (1976), 45 Ohio St.2d 249, 255, 74 O.O.2d 415, 418, 344 N.E.2d 118, 121–122; see, also, Annotation (1924), 35 A.L.R. 1432, and Annotation (1941), 135 A.L.R. 646.

While courts have been hesitant to add a "just cause" requirement to this doctrine, courts have allowed evidence as to the facts and circumstances surrounding such an agreement, such as the type of employment, custom, course of dealing between the parties, company policy, the parties' intent, or any other fact which would aid the trier of fact "to determine the agreement's explicit and implicit terms concerning discharge." *Id.* at 103, 104, 19 OBR at 263, 264, 483 N.E.2d at 153, 154; see, also, *Henkel v. Educational Research Council* (1976), 45 Ohio St.2d 249, 251, 252, 74 O.O.2d 415, 416, 344 N.E.2d 118, 119, 120.

In determining whether Gigax was an at-will employee, we must take into account that MVC is a close corporation, that the parties are all directors, shareholders, and employees of MVC, and that until Gigax's termination, all the parties worked for MVC without an employment agreement, in order to determine whether Gigax was an at-will employee terminable at any time by the majority shareholders.

A "close corporation" has been defined by the Ohio Supreme Court as a corporation with few shareholders and whose shares are not generally traded on a national securities exchange or regularly quoted on an over-the-counter market. *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 107, 548 N.E.2d 217, 219; *Estate of Schroer v. Stamco Supply* (1984), 19 Ohio App.3d 34, 36, 19 OBR 100, 102, 482 N.E.2d 975, 976. Therefore, the shares of a close corporation are rarely bought and sold and there are usually restrictions on the free alienability of shares. *Estate of Schroer v. Stamco Supply, supra,* at 36–37, 19 OBR at 102–103, 482 N.E.2d at 978. A close corporation is also characterized by an identity of management and ownership. *Id.* Because a close corporation strongly resembles a partnership, the participants often consider themselves as partners *inter sese* while obtaining the advantages of the corporate form. *Id.* at 37, 19 OBR at 103, 482 N.E.2d at 978, citing 1 O'Neal, Close Corporations (2 Ed.1971), Section 1.04. This resemblance has permitted courts to venture outside the laws of corporations "to borrow from allied disciplines those principles and rules which seem best to comport with the mixed nature of the close corporation form." *Id.* at 37, 19 OBR at 103, 482 N.E.2d at 978.

A drawback to the nature of a close corporation is that majority shareholders can easily abuse their corporate control to the disadvantage of the minority shareholders. Minority shareholders are particularly vulnerable because they

are small in number and cannot easily protect their financial interests because there is usually no readily available market for their stock. Because of the close relationship between majority shareholders and the actual operation of a close corporation:

" * * * the form is peculiarly susceptible to a particular form of misuse or abuse by the majority or controlling shareholders. Commonly known as a 'squeeze-out' or 'freeze-out,' it refers to manipulative use of corporate control to eliminate minority shareholders * * * or otherwise unfairly deprive them of advantages or opportunities to which they are entitled." *Estate of Schroer, supra,* at 37–38, 19 OBR at 103–104, 482 N.E.2d at 978–979, citing O'Neal, "Squeeze-outs" of Minority Shareholders: Expulsion or Oppression of Business Associates (1975).

In response to this problem, numerous courts have "borrowed" a rule from partnership law, and have held that majority shareholders have a heightened fiduciary duty, one of the utmost good faith and loyalty, to the minority shareholders. *Estate of Schroer, supra* at 37–38, 19 OBR at 103–104, 482 N.E.2d at 978–979. Thus, a majority shareholder's fiduciary duty prohibits him from using his power to promote his personal interests at the expense of corporate interests. *Crosby, supra,* quoting *United States v. Byrum* (1972), 408 U.S. 125, 137, 92 S.Ct. 2382, 2390, 33 L.Ed.2d 238, 247. In *Crosby,* the Ohio Supreme Court held that:

"Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, *absent a legitimate business purpose,* is actionable." (Emphasis added.) *Crosby,* 47 Ohio St.3d at 109, 548 N.E.2d at 220.

The *Crosby* court also cited the decision in *Wilkes v. Springside Nursing Home, Inc.* (1976), 370 Mass. 842, 353 N.E.2d 657, where it was held that:

" * * * majority shareholders breached their fiduciary duty to the minority by removing a minority shareholder from the payroll of a close corporation, which had never paid a dividend, and there was no legitimate business purpose for the removal."

This finding was applied in a similar case by the Cuyahoga County Court of Appeals. In *B & W Custom Cabinets, Inc. v. Worthington* (Apr. 23, 1992), Cuyahoga App. No. 169801, unreported, 1992 WL 83821, Worthington, the president, employee, and minority shareholder of a close corporation, was terminated as president and employee without a legitimate business purpose. The court found Worthington's situation to be unique because his participation in the

corporation was more than an investment, it was his life's work and he depended on it completely for his livelihood. *Id.*

In addition to the requirement that partners in a partnership act toward each other with the utmost good faith and integrity, each partner is required to consult and inform his co-partner as to partnership matters. *Leigh v. Crescent Square, Ltd.* (1992), 80 Ohio App.3d 231, 608 N.E.2d 1166, unreported, citing 13 Ohio Jurisprudence 3d (1979) 84, 85, Fiduciary Relationship and Obligation, Section 959.

In the present case, the trial court found that MVC is a close corporation, that Repka and Lensch are majority shareholders, and that Gigax is a minority shareholder. The court further found that as of March 1992, Repka, Lensch, and Gigax were employees of MVC, but that there was no employment agreement, stock buy-sell agreement, or close corporation agreement pursuant to R.C. 1701.591(A).

The trial court considered the issue to be whether the employment of a minority shareholder in a close corporation can be terminated by the majority shareholders for ostensibly legitimate, but not particularly compelling, business reasons.

Relying on the holding in *Crosby, supra,* that majority stockholders in a close corporation cannot use their position to receive benefits denied to minority shareholders, the trial court found that the parties' employment at MVC was a shared benefit. However, the court was concerned that with:

" * * * strict adherence to the continued employment of a minority shareholder as a fiduciary requirement, the majority can be saddled with a corporate millstone (the unproductive, unprofitable employee) whose continued employment drags the corporation asunder to the detriment of all the shareholders—majority and minority alike. Some reasonable relationship between the fiduciary duty to minority shareholder/employee, and the fiduciary duty to the corporation of the majority shareholder, officer/director of such corporation must exist. See 12 O.Jur.3d, Sec. 420; Business Relationships—Fiduciary Duties of Officers & Directors."

The court concluded by finding that as Ohio is an employment-at-will state, the absence of an employment contract, shareholders' agreement, any other recognized exception to the at-will doctrine, or a demonstrable intention by the majority to compromise or deprive the minority of the benefits of their investment, there was no cause to enjoin MVC's termination of Gigax's employment.

We agree with the finding of the trial court that MVC is a close corporation, as it has few shareholders, its shares are not generally traded on a

national exchange and are rarely bought and sold, and because there is an identity of management and ownership. However, we disagree with the finding that employee/shareholder/directors in a close corporation are at-will employees terminable *at any time* by the majority or controlling shareholder/directors.

As we held in *Leigh v. Crescent Square, Ltd., supra,* partners are to act toward each other with the utmost good faith and integrity, consult and inform co-partners as to matters outside their partnership agreement, refrain from obtaining personal profit from confidential partnership information, and refrain from participating in activities which are in direct conflict with the partnership's interests. With respect to expelling a partner, we held that a general partner's fiduciary duty applies only where a partner will take advantage of his position in the partnership for his own profit or gain, and that an ouster initiated for legitimate business purposes and in good faith does not violate this fiduciary duty.

In the instant case, the evidence shows that each partner of MVC experienced a decline in profitability at some time since its formation in 1978. Repka and Lensch admitted in their testimonies that the decline of profitability in the jobs assigned to Gigax was not necessarily attributable to him, and that Gigax was not apprised of his partner's dissatisfaction with his profitability prior to his removal.

The fiduciary duty which the partners owe each other requires that the removal of a partner be based on legitimate business reasons. Our holding today balances the need to protect the minority shareholder-employee with the needs of the close corporation in ridding itself of the unproductive or troublesome employee.

Accordingly, we find Gigax's first, second, third, and fourth assignments of error well taken.

In his fifth assignment of error, Gigax asserts that the trial court erred in holding that Gigax is an employee and not an employer. Specifically, Gigax asserts that his position as a principal of the firm, a shareholder, director, officer, past president, and partner in the MVC Leasing partnership requires a finding that he was an employer and owner of MVP rather than a mere employee, and that therefore the trial court erred in applying the employment-at-will doctrine to this case.

We agree with the trial court that partners in a close corporation or a partnership are employees. Moreover, the crux of this assignment of error appears to be Gigax's disagreement with the trial court's application of the

employment-at-will doctrine. As we previously discussed this issue in the first four assignments of error, this assignment of error is moot pursuant to App.R. 12.

In their cross-appeal, the appellees contend that the trial court erred in holding that they must pay Gigax for ninety days after his termination. Specifically the appellees assert that this ruling is completely incongruous with the ruling that Gigax was terminable "at-will" and because the decision was rendered without any hearing on damages or other due process.

Due to our disposition of the issues in the first five assignments of error, the issue in this assignment of error has been rendered moot. See App.R. 12(A)(1)(c).

The judgment of the Montgomery County Court of Common Pleas is hereby reversed and the cause is remanded for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

WILSON, J., concurs.

GRADY, J., concurs separately.

GRADY, Judge, concurring.

I agree with the rationale of Judge Brogan's opinion. In addition, I would hold that the $70,000 in equity contributions made to the corporation by Gigax constitute consideration for his employment in addition to the services he provided, taking the relationship outside the "at-will" definition in *Mers*. (See Judge Brogan's opinion, *supra*.) I would reverse on that basis, also.