DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal and cross-appeal of a judgment of the Erie County Court of Common Pleas after a bench trial. The trial court adopted appellees' findings of fact and conclusions of law with regard to all but one of appellant's claims. For the following reasons, we reverse the trial court's judgment in part and affirm it in part.
 {¶ 2} This case arises out of an anesthesia medical practice involving appellant, Dr. Nicholas J. Mulchin, and appellees, Drs. David W. Deehr and Nicholas Liben, and appellee/cross-appellant corporation, ZZZ Anesthesia, Inc. Prior to mid-1994, appellant operated under his own wholly owned corporation, Lake Erie Anesthesiology, Inc. and Deehr operated under his separate wholly owned corporation, ZZZ Anesthesia, Inc. (f.k.a. David Deehr, D.O., Inc.).[1] Both anesthesiologists practiced at Fisher-Titus Hospital in Norwalk, Ohio.
 {¶ 3} In mid-1994, appellant and Deehr orally agreed to join their practices under one corporation. Deehr presented appellant with a written employment agreement but appellant refused to sign it, claiming that the prior oral agreement they had reached was based on joint ownership of the corporation. However, ZZZ began paying appellant a $125,000 annual salary.
 {¶ 4} On September 12, 1995, upon purchase of stock, appellant and Liben, along with existing owner Deehr, each became one-third owners of ZZZ. On October 1, 1995, appellant, Deehr, and Liben each executed separate employment contracts with ZZZ. Under the terms of the contract, each were to be paid an annual salary of $125,000, with a productivity bonus provision to be based on a pro-rata share of "units of anesthesia" performed by each employee. Further, the Board of Directors of ZZZ, "through its scheduling officer," would attempt to schedule the work assignments as equally as possible among the three physician-employees. The contract included a clause prohibiting unauthorized "moonlighting." Finally, the contract also provided for termination of employment at the option of either ZZZ or the employee after not less than 90 days written notice.
 {¶ 5} Thereafter, appellant repeatedly informed Deehr and Liben, verbally and in writing, that he did not believe the caseload was effectively balanced so as to more closely equalize the three physicians' pay. In 1998, upon appellant's motion and a full vote, the annual base salary for each physician was raised to $175,000. However, appellant continued to be dissatisfied with the work distribution and related productivity bonus.
 {¶ 6} In August 2001, ZZZ hired new medical school graduate, anesthesiologist Dr. Todd Keller as an employee. On November 5, 2001, by vote of Deehr and Liben, appellant's employment with ZZZ was terminated with a 90 day written notice. Appellant was offered a $7,500 stock buy-out.
 {¶ 7} On January 22, 2003, appellant filed his original complaint. On July 26, 2004, with leave of court, appellant filed a first amended complaint. Count 1 was a claim for breach of oral contract/promissory estoppel against appellee Deehr for ZZZ corporate ownership benefits for the period of July 1994 through September 1995. Count 2 was a claim for breach of contractual duties against all appellees asserting that they failed to allocate the caseload equally among the ZZZ doctors and that Deehr and Liben engaged in outside medical practices in violation of the "moonlighting" prohibition in the employment contract. Count 3 was a claim for breach of fiduciary duties asserting that Deehr and Liben breached their fiduciary duties to appellant in various ways.
 {¶ 8} Following a bench trial on May 4-6, 2005, the trial court requested that the parties each file proposed findings of fact and conclusions of law. In addition, on May 31, 2005, appellant filed a request for findings of fact and conclusions of law from the court pursuant to Civ.R. 52. On June 6, 2005, the trial court entered its judgment adopting appellees' proposed findings as it pertained to Counts 1, 2 and 3 of appellant's complaint, finding in favor of appellees on those counts. However, the trial court rendered judgment in favor of appellant and against appellees on count six relative to payment of tail/retro professional liability insurance coverage for appellant. The trial court noted that Counts 4, 5 and 7 of appellant's complaint had been voluntarily withdrawn by appellant at trial.
 {¶ 9} Appellant filed the instant appeal of the judgment on Counts 1, 2, and 3. ZZZ filed a cross appeal of the trial court's judgment for appellant on Count 6 relative to payment of tail insurance premiums of $39,717 plus 10 percent interest.
 {¶ 10} Appellant sets forth the following seven assignments of error:
 {¶ 11} "A. The Trial Court Erred in Failing to Find That Defendants, Deehr and Liben, Acting in Concert as Majority Shareholders and Directors of A Closely Held Corporation, Breached Their Fiduciary Duties to Act With the Utmost Care and Loyalty to Plaintiff, Dr. Mulchin, a Minority Shareholder * * *
 {¶ 12} "B. The Trial Court Erred in Failing to Find That Defendants Deehr and Liben Breached Their Fiduciary Duties to the Minority Shareholder, Dr. Mulchin, by Authorizing and Paying Out of ZZZ Anesthesia, Inc.'s Corporate Funds the Legal Fees and Expenses Incurred in Defending This Action in the Approximate Sum of $118,000.
 {¶ 13} "C. The Trial Court Erred in Failing to Find that Defendant, ZZZ Anesthesia, Inc., Breached Its 10-1-1995 Contract With Dr. Mulchin by Not Having a Scheduler Attempt to Schedule Work Assignments as Equal as Possible Between Drs. Liben and Mulchin.
 {¶ 14} "D. The Trial Court Erred in Failing to Award Any Damages as a Result of Defendants' Breach of Their Fiduciary Duties to Him and the Breach of the Employment Contract.
 {¶ 15} "E. When a Minority Shareholder/Employee is Terminated From Employment and Receives No Compensation For His Ownership Interest in a Closely Held Corporation as a Result of the Majority Shareholders' Breach of Their Fiduciary Duties, the Minority Shareholder May Recover the Loss of the Fair Value of His Ownership Interest in the Closely Held Corporation.
 {¶ 16} "F. The Trial Court Erred in Finding That Dr. Mulchin Did Not Acquire an Ownership Interest in ZZZ Anesthesia, Inc. Beginning July 1, 1994, and/or Plaintiff Sustained No Damage as a Result of Being Treated as an Employee Rather Than a Majority Owner/Partner.
 {¶ 17} "G. The Trial Court Erred in Failing to Make Findings of Fact and Conclusions of Law in Accordance With and in the Manner Required by Ohio Civil Rule 52."
 {¶ 18} In these assignments of error, appellant challenges the findings of fact and conclusions of law of the trial court which granted judgment for appellees on Counts 1, 2 and 3 of appellant's first amended complaint. "Upon review of a trial court's judgment following a bench trial, an appellate court is `guided by the presumption' that the trial court's findings are correct." Patterson v. Patterson, 3d Dist. No., 2005-Ohio-2254
at ¶ 26, quoting Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 79-80. "Accordingly, such a judgment that is supported by some competent, credible evidence will not be reversed on appeal unless it is against the manifest weight of the evidence."Patterson at P. 26 citing Seasons Coal and C.E. Morris Co. v.Foley Construction Co. (1978), 54 Ohio St.3d 279; App.R. 12(C). This rule applies to the lower court's findings of fact as well as the conclusions of law. Patterson at ¶ 26 citing The State,ex re. Pizza v. Strope (1990), 54 Ohio St.3d 41, 46. "`[W]here there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court.'"Patterson at ¶ 26 quoting Myers v. Garson (1993),66 Ohio St.3d 610, 614.
 {¶ 19} We find it necessary to address appellant's final assignment of error first. In his assignment of error, labeled "G," appellant argues that the trial court committed reversible error by failing to set forth sufficient findings of fact and conclusions of law as required by Civ.R. 52. Civ.R. 52 provides that "[w]hen questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise before the entry of judgment * * * in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law." In the case before us, appellant made such a written request. Appellant now asserts that the trial court's adoption of appellees' proposed findings of fact and conclusions of law was insufficient to meet the requirements of Civ.R. 52, in part, because it failed to outline any witness credibility determinations.
 {¶ 20} The purpose of Civ.R. 52 is "`to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment.'" In re Adoption Gibson
(1986), 23 Ohio St.3d 170, 172 quoting Werden v. Crawford
(1982), 70 Ohio St.2d 122, 124. "In light of its purpose, while there is no precise rule regarding compliance with Civ.R. 52, the findings and conclusions must articulate an adequate basis upon which a party can mount a challenge to, and the appellate court can make a determination as to the propriety of, resolved disputed issues of fact and the trial court's application of the law." New Haven Corner Carry Out, Inc. v. Clay Distrib. Co.,
3rd Dist. No. 13-01-30, 2002-Ohio-2726 at ¶ 63 citing Stone v.Davis (1981), 66 Ohio St.2d 74, 85. Further, clearly, it is not per se error for a trial court to adopt, verbatim, a party's proposed findings of fact and conclusions of law. Chardon Park,Inc. v. Great Lakes Crushing. Ltd., 11th Dist. No. 2003-G-2524,2004-Ohio-7221 at ¶ 39; Error can only be found in such a case when the findings of fact and/or conclusions of law adopted by the trial court are against the manifest weight of the evidence. Id.
 {¶ 21} To the extent that appellant claims error by the fact that the trial court adopted appellees' proposed findings and conclusions, we will address the accuracy of the trial court's findings in our review for manifest weight of the evidence relative to appellant's other assignments of error. Further, we find that the trial court's findings of fact and conclusions of law via adoption of appellees' 20 page proposed findings and conclusions did articulate an adequate basis upon which this court can make a determination as to the propriety of resolved disputed issues of fact and the trial court's application of the law. Therefore, appellant's assignment of error "G" is not well-taken.
 {¶ 22} With regard to the remaining assignments of error, we find it helpful to examine them in terms of the three complaint counts they address. Assignments of Error A, B, D, and E concern the trial court's ruling on Count 3 of appellant's complaint (breach of fiduciary duties). Assignments of error C and D concern the ruling on Count 2 (breach of contract). Finally, Assignment of error F relates to Count 1 (promissory estoppel relative to interest in ZZZ from mid-1994 to October 1995).
 {¶ 23} In his first assignment of error, appellant asserts that Deehr and Liben breached their fiduciary duties to appellant in five ways: (1) terminating him without any business justification; (2) not providing any compensation for his one-third ownership interest in ZZZ Anesthesia; (3) the manner and means by which Deehr and Liben terminated appellant; (4) refusing and ignoring appellant's repeated requests to equalize the work schedule and work assignments; and (5) permitting Liben to obtain a disproportionate amount of the corporate business and bonuses.
 {¶ 24} "`As this court has discussed previously, shareholders in a close corporation generally have a heightened duty to one another which includes a duty to disclose.' Terry v. Carney
(Dec. 29, 1995), Ottawa App. No. OT-94-054. Majority shareholders owe minority shareholders a fiduciary duty, whereby the majority shareholders owe minority shareholders good faith, loyalty, disclosure, and an obligation to refrain from self-dealing. Wingv. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108. Absent a legitimate business purpose, majority shareholders in a close corporation owe a duty to all minority shareholders not to utilize their majority control to their own advantage without providing minority shareholders with an equal opportunity to benefit. Crosby v. Beam (1989), 47 Ohio St.3d 105, at paragraph two of the syllabus. The heightened fiduciary duty of majority shareholders in a closely held corporation arises from the opportunity for oppressive majority control and the limited market for minority shares. Id. at 108. * * *" Binsack v. Hipp
(June 5, 1998), 6th Dist. No. H-97-029.
 {¶ 25} In two cases, Cruz v. South Dayton UrologicalAssociates, Inc. (1997), 121 Ohio App.3d 655, and Schafer v.RMS Realty (2000), 138 Ohio App.3d 244, the Second District Court of Appeals noted what, at first blush, appears to be a tension between the concept of freedom of contract, and the fiduciary duty of majority stockholders when there is an employment or other contract purporting to govern the parties' relationship. The court noted "* * * that the law is clear, concerning close corporations, that majority or controlling stockholders are liable, absent a legitimate business purpose, if they breach their heightened fiduciary duty to the minority by using their majority control to their own advantage and do not provide minority shareholders with an equal chance to benefit."Schafer at 274 citing Gigax v. Repka (1992),83 Ohio App.3d 615 and Crosby at 109. As a general proposition, the contract at issue controls. Id. However, even if the corporate decision itself cannot be contested by virtue of the specific terms of the agreement, the manner in which the decision is made cannot violate the majority's fiduciary duty. Id.
 {¶ 26} With regard to appellees' fiduciary duty relative to appellant's termination of employment, generally, in a closely held corporation, an employee-director-shareholder is not an at-will employee. Morrison v. Gugle (2001),142 Ohio App.3d 244, 255 citing Gigax at 623. However, in the context of a wrongful termination case, the Second District Court of Appeals has found that an employee-director-shareholder can waive his right to argue that the majority shareholders breached their fiduciary duty to him because they lacked a legitimate business reason for terminating the employee-director-shareholder's employment. See Cruz v. South Dayton Urological Associates,Inc. (1997), 121 Ohio App.3d 655.
 {¶ 27} Similar to the physician minority shareholder-employee in Cruz, appellant claims that the other shareholders of ZZZ breached the fiduciary duty which they owed him in terminating him without a legitimate business reason. Id. at 663. Also similar to the present case, Cruz' employment agreement provided that either the corporation or the employee could terminate the employment contract, unilaterally and without specification of cause, upon 90 days' written notice. Id. at 658. The court concluded that when Cruz agreed that the corporation could terminate him without specification of cause, he relieved the corporation and the other shareholders of any duty they owed him to exercise their power of termination only for good cause. Id. at 663. In so doing, Cruz waived his right to argue that the defendants breached their fiduciary duty to him because they lacked a legitimate business reason for their action. Id. Summary judgment for the defendants on Cruz' claim for breach of fiduciary duty in terminating him without a legitimate business reason was proper. Id. Likewise, in the present case, judgment for appellees on appellant's claim for breach of fiduciary duty in terminating him without a legitimate business reason was not against the manifest weight of the evidence.
 {¶ 28} Also similar to Cruz, appellant claims a breach of fiduciary duty with respect to the manner of his termination. In Cruz, the court found that questions of fact existed on this claim. Likewise, in Schafer, the court found that under the partnership agreement, the minority partner could not contest a capital call itself, but he could bring an action for breach of fiduciary duty if the defendants acted in bad faith or in a duplicitous manner by voting for and proceeding with the capital call. Id. at 274. Thus, the court rejected the defendants' argument that the minority partner's action for breach of fiduciary duty was barred as a matter of law. Id. at 278. Further, based on substantial, probative evidence in the record that the defendants violated their heightened fiduciary duty of "utmost good faith and loyalty" when they used theirmajority control to their advantage, the court rejected the defendants' claim that the jury verdict for the minority partner was against the manifest weight of the evidence. Id. There was ample evidence that the majority interests joined together and issued a capital call in order to squeeze the minority partner out of a lucrative deal, dilute his partnership interest, and take the profit for themselves.
 {¶ 29} In contrast to Schafer, in the present case, we cannot say there was "ample" evidence that the majority interests joined together to take the profit for themselves because there was evidence on both sides relative to whether appellees would profit from appellant's employment termination. Appellant's expert, Grover L. Rutter, CPA, essentially testified that Dr. Keller was hired three months before appellant's termination as a cheaper "replacement" revenue generator. However, appellee's expert, Ronald E. Baden, CPA, testified that Deehr and Liben would lose the share of revenue that appellant was bringing in to the corporation. Further, Deehr testified that the plan was for Dr. Keller eventually to come in as a shareholder/owner in ZZZ. When Liben was hired in 1994, he was likewise subject to a probationary-type period as strictly an employee. Therefore, the trial court's ruling on appellant's claim of breach of fiduciary duty by the manner in which he was terminated was not against the manifest weight of the evidence.
 {¶ 30} Assignments of Error D and E are tied in with the portion of appellant's assignment of error A which claims a breach of fiduciary duty by Deehr and Liben by failing to provide any compensation for appellant's one-third ownership interest in ZZZ Anesthesia. In Werthmann v. Donet, Inc., 2d Dist. No. 20814, 2005-Ohio-3185, the court found that summary judgment to the defendants was proper on the minority shareholder's breach of fiduciary duty claim based on the defendants' "insufficient" offer to buy back his stock. The court held that since no sale actually occurred, and the minority shareholder still retained his stock, he had not yet suffered a loss. Id. at ¶ 74. However, the court noted that the minority shareholder could still have a claim for breach of fiduciary duty based on the majority shareholders "duping" him into agreeing to modifications of the close corporation agreement that were part of an alleged "freeze-out" or "squeeze out." Id. at ¶ 66, 75.
 {¶ 31} Similar to Werthmann, by virtue of retaining his stock, appellant has not yet suffered a loss. Further, even if there was some breach of duties on this issue, there were competing expert opinions regarding damages. Appellant's financial expert, Rutter, testified that he did not "value the business" of ZZZ, rather he "placed an economic quantification on the foregone benefits streams claimed" by appellant. Rutter used the capitalization methodology starting with a 2001 calculated stream of income of bonus or profit for appellant of $137,754, presuming "had things been equal" between appellant and Liben. Rutter then walked the trial court through his calculation to arrive at $532,897 as the "quantification" as of year end 2001. But on cross-examination, Rutter acknowledged that any "real life" limit on appellant's availability to take cases was "beyond the scope of his project." Further, Rutter agreed that as a Schedule C corporation, it was not unusual that ZZZ did not pay dividends to its shareholders to avoid extra taxes. Finally, Rutter agreed that his calculation was designed to compensate appellant for his inability to earn future bonus money by virtue of termination of his employment with ZZZ. In contrast, appellee's expert, Baden, disagreed with Rutter's method of estimating the value of ZZZ, a medical service provider. Baden did not agree with Rutter's calculation which included accounts receivable which were paid out to appellant. Baden opined that the service corporation itself has no profits under the physician bonus distribution system. Further, Baden testified that an owner's share of a professional service corporation such as ZZZ would be of "nominal value" with just the value of the hard assets of the corporation. In addition, Liben testified that the benefit he receives as a shareholder (as opposed to as an employee) of ZZZ is merely the right to vote on corporate matters, implying that this was the only thing appellant had lost. The trial court's finding that appellant did not sustain any damages by virtue of appellees' failure to provide any compensation for appellant's one-third ownership interest in ZZZ after his employment termination was not against the manifest weight of the evidence.
 {¶ 32} Appellant also asserted a breach of fiduciary duty claim by Deehr and Liben based on allegedly refusing appellant's repeated requests to equalize the work assignments and permitting Liben to obtain a disproportionate amount of the corporate business and bonuses. We address the equalization duties and efforts in our discussion of appellant's breach of contract claim elsewhere in this opinion. However, we conclude that the trial court's finding was not against the manifest weight of the evidence.
 {¶ 33} On the final part of appellant's breach of fiduciary duties claim, in Assignment of Error B, appellant claims error in the trial court's failure to find ZZZ's payment of Deehr's and Liben's attorney fees a breach of Deehr's and Liben's fiduciary duties to appellant. Appellees assert that this claim is not properly before this court since it was not presented to the trial court at or before trial. In response, appellant references his claim of breach of fiduciary duties as stated in his first amended complaint including the very general portion "in other ways to be determined."
 {¶ 34} Civ.R. 15(B) treats issues that were not raised in the pleadings as if they were so raised, as long as they were tried with the express or implied consent of the parties and substantial prejudice will not arise as a result. McCartney v.Universal Electric Power Corp., 9th Dist. No, 21643, 2004-Ohio-959 at ¶ 7 citing Evans v. Bainbridge Twp. Trustees
(1983), 5 Ohio St.3d 41 at paragraph one of the syllabus. Upon review of the record, we agree with appellees that this claim was not presented to the trial court until appellant submitted his proposed findings of fact and conclusions of law. This claim was not pled or tried with the express or implied consent of appellees and the trial court could not fashion relief based on it. See McCartney at ¶ 11 and Franklin Cty. Dist. Bd. ofHealth v. Shree Gunatit Corp., 10th Dist. No. 01AP-1264, 2002-Ohio-3247 at ¶ 21. Accordingly, the trial court's failure to find payment of attorney fees as a basis for breach of fiduciary duties was not against the manifest weight of the evidence. Appellant's Assignments of Error A, B and E are not well taken.
 {¶ 35} Regarding appellant's Assignments of Error C and D concerning Count 2, breach of contract, in any action based on contract, "[t]he cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." Foster Wheeler Enviresponse, Inc. v. FranklinCty. Convention Facilities Auth., 78 Ohio St.3d 353, 361,1997-Ohio-202, citing Aultman Hosp. Assn v. Community Mut. Ins.Co. (1989), 46 Ohio St.3d 51, 53. "`The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'" Id., quoting Kelly v. Med. Life Ins.Co. (1987), 31 Ohio St.3d 130, paragraph one of the syllabus. It is a tenant of contract interpretation that "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Alexander v. Buckeye Pipe Line Co. (1978),53 Ohio St.2d 241, paragraph two of the syllabus.
 {¶ 36} Contract language is ambiguous "if it is unclear, indefinite, and reasonably subject to dual interpretations * * *." Beverly v. Parilla, 165 Ohio App.3d 802,2006-Ohio-1286, at ¶ 24. When a court finds an ambiguity in the contract language, the intent of the parties becomes a question of fact; in order to ascertain such intent, the trier of fact may rely on extrinsic evidence. Id. at ¶ 26.
 {¶ 37} In his testimony, Deehr admitted that, in apparent contravention of the employment contract language, there never was a corporate "scheduling officer" officially charged with the responsibility of attempting to equalize work assignments. However, Deehr and Liben testified that they made some efforts to equalize the caseload as far as possible given the framework of the hospital's scheduling policies, which were also known to appellant at the time he executed his employment contract. In this regard, Patrick J. Martin, president of the hospital testified that although the hospital has no direct control over which anesthesiologist(s) is/are made available by ZZZ on a certain day, the hospital has a scheduling policy which honors patient and surgeon preference. As the following testimony seems to indicate, Martin seemed to agree that the hospital could have a problem with forced equalization of anesthesiologists to the extent that it interfered with patient or surgeon preference:
 {¶ 38} "Q. * * * [I]f Triple Z were to tell you that Dr. Liben wasn't available every Wednesday, for example, at some point that might interfere with the hospital scheduling process; is that correct?
 {¶ 39} "A. Yes, sir.
 {¶ 40} "Q. Especially to the extent that surgeon preference was important for the hospital?
 {¶ 41} "A. Surgeon preference and availability.
 {¶ 42} "Q. Okay. So in order to let's say give Dr. Mulchin a boost in his practice, you might have a problem with Triple Z telling Dr. Liben to sit down for a day every week; would that be a fair statement?
 {¶ 43} "A. In order to give Dr. Mulchin a boost?
 {¶ 44} "Q. Yes. To give him an opportunity to capture more cases.
 {¶ 45} "A. Well, he's got the same accessibility as anybody does.
 {¶ 46} "Q. Well, not if Triple Z tells Dr. Liben to take a forced vacation every Wednesday?
 {¶ 47} "A. Well, I guess that's true."
 {¶ 48} Hospital scheduler, Nancy Derby, also testified regarding the computer-based system of assignment of anesthesiologists to surgical cases. It was driven primarily by anesthesiologist availability, and secondarily, by surgeon or patient preference. If initially the surgeon expressed no preference, the scheduler informed the surgeon of the names of all the available anesthesiologists and pressed the surgeon to make a choice. It was hospital policy that the scheduler was not the one who made the ultimate choice among available anesthesiologists.
 {¶ 49} At the primary scheduling process level, there was some conflicting testimony regarding the degree to which appellant's law school endeavor decreased his availability to practice anesthesia. Deehr testified that appellant's availability was greatly limited by his law school schedule in 1994 and 1995. He testified that appellant regularly was not available during the week after 2:00 p.m. Deehr testified that appellant generally was available weekends during which the hospital had a lighter anesthesiology need. Appellant testified that in 1994, his first year of law school, he attended exclusively at night with classes that did not start until 6:00 p.m. However, he also testified that in 1996, he had to leave by noon for certain classes two days each week and in 1999, he was not available in late afternoon because of a 3:00 p.m. or 4:00 p.m. class.
 {¶ 50} At the secondary scheduling process level — surgeon preference — Liben admitted that one high volume surgeon, Dr. Carver, seemed to request him a majority of the time. In addition, appellant admitted to having a "tiff" with one particular surgeon. Regarding efforts to equalize, Liben testified that he spoke to several surgeons in an effort to balance the caseload. Further, Liben testified that he increased his own annual vacation time by two weeks, and spoke to hospital scheduler Derby and received assurances that there wasn't anything in the scheduling policy or practice that favored one anesthesiologist over another. On the other side, Derby could not specifically recall such a conversation with Liben. Further, appellant testified that he was not aware of any efforts that appellees made to equalize the caseload. Reviewing the record, we conclude that a finding of no breach of the equalization provision was not against the manifest weight of the evidence.
 {¶ 51} Even assuming arguendo, that appellees breached the caseload equalization provision of appellant's employment contract, there was disputed evidence regarding damages. Appellant's financial expert, Rutter, testified regarding bonuses due appellant from the period of mid-1995 through 2002, with a starting point of appellant's and Liben's compensation added together and divided by two. Rutter's presumption for his calculation was that under the contract the caseload as well as the compensation between Liben and appellant would be equalized. However, appellee's expert, Baden, did not agree with excluding Deehr's compensation in the calculation. Baden essentially found no damages to appellant. A trial court is free to accept or reject, in whole or in part, the testimony or opinions of any witness, whether accepted as an expert or not and determine the weight and credibility to be given thereto. Jackson v. Jackson,
5th Dist. No. 03-CA-17, 2004-Ohio-816 at ¶ 21 citing State v.DeHass (1967), 10 Ohio St.2d 230. We find the trial court's findings relative to appellant's breach of contract claims were not against the manifest weight of the evidence. Assignments of Error C and D are not well taken.
 {¶ 52} Finally, relative to appellant's Assignment of Error F, initially we note that in his reply brief, appellant apparently concedes that appellees properly pled a statute of limitations defense and that the trial court could have ruled on Count 1, claim of promissory estoppel, covering the mid-1994 to October 1995 period on this basis. The trial court did so, concluding that the claim was time-barred by a six-year statute of limitations. We agree. However, appellant still claims that he would be entitled to damages since the agreement memorialized in the October 1, 1995 employment contract somehow reflected an ownership interest and it was to be applied retroactively.
 {¶ 53} The record reveals that appellant did not purchase his one-third share of corporate stock until a September 12, 1995 corporate meeting. The minutes of this meeting do not indicate any retroactivity. Further, the October 1, 1995 employment contract does not include any retroactivity provision. What essentially boils down to a credibility determination by the trial court of Deehr's testimony over appellant's relative to an oral retroactivity provision to the October 1, 1995 employment contract will not be disturbed under a manifest weight standard. When deciding whether a judgment is against the manifest weight of the evidence, the reviewing court considers and weighs the evidence to see if the appropriate burden of persuasion has been met. Schafer at 278 citing State v. Thompkins (1997),78 Ohio St.3d 380, 390 (Cook, J., concurring). Even so, the reviewing court must still defer to the trier of fact's greater ability to assess credibility. Schafer at 278. Assignment of Error F is not well-taken.
 {¶ 54} Relative to ZZZ's cross-appeal regarding its alleged contractual obligation to provide tail insurance for appellant, ZZZ argues that the trial court read appellant's employment contract provision too expansively on this issue. ZZZ further notes that there was no evidence that appellant actually purchased tail coverage himself for this period of time, thus, incurring no damages. In contrast, appellant argues that construing his employment contract as a whole, the "professional liability insurance" ZZZ was obligated to provide included the cost of tail insurance for appellant. Further, appellant testified that he essentially will pay for coverage for acts he committed while employed with ZZZ by virtue of occurrence coverage he has purchased from another company since leaving ZZZ. He testified that he "deferred his tail" payment by purchasing a certain insurance product. Appellant further contends that ZZZ's insurance agent's $39,717 estimate of the cost of tail insurance is evidence of his damages.
 {¶ 55} ZZZ cites Mid Ohio Family Practice, Inc. v. Cavazos
(Dec. 18, 1997), 3d Dist. No. 9-97-45 in support of its position. In Cavazos, the court found that the employment contract itself was "silent as to whether medical malpractice tail coverage is included in [medical malpractice] coverage." Apparently construing this silence as an ambiguity, the court resorted to an examination of the "intent of the parties" to the contract beyond the language of the contract. There was disputed testimony regarding the parties' intent relative to tail insurance. The court observed that the intent of the parties is a factual question that should be resolved by the finder of fact. Id. citing Normandy Place Assoc. v. Beyer (1982), 2 Ohio St.3d 102. A review of the record revealed that testimony was presented that, if believed, would support the trial court's decision that the parties did not intend tail coverage.
 {¶ 56} What is clear from Cavazos is that when a contract is silent as to whether medical malpractice tail coverage is included in medical malpractice coverage, and there is disputed evidence regarding the parties' intent relative to tail coverage, that factual question should be resolved by the finder of fact. Further, such finding must not be disturbed absent an abuse of discretion. In the present case, similar to Cavazos,
the contract is silent as to whether "professional liability insurance" includes tail insurance. While there was testimony that tail insurance was not intended, there was also testimony that it was intended. A review of the record reveals that testimony was presented that, if believed, would support the trial court's decision that the parties did intend tail coverage. Further, even under a manifest weight standard as asserted by ZZZ and as appropriate under review of findings of fact and conclusions of law, the trial court's finding of ZZZ's liability was not against the manifest weight of the evidence produced at trial. ZZZ's first assignment of error in its cross-appeal is not well taken.
 {¶ 57} ZZZ also asserts that based on Hilliard v. FirstIndus., L.P., 10th Dist. No. 05AP-131, 2005-Ohio-6469, interest should not be 10 percent on the judgment for appellant, but should be recalculated to conform with R.C. 1343.03, as amended by 2004 HB 212, effective June 2, 2004. We agree. Section 3 of House Bill 212, provides:
 {¶ 58} "The interest rate provided for in division (A) of section 1343.03 of the Revised Code, as amended by this act, applies to actions pending on the effective date of this act. In the calculation of interest due under section 1343.03 of the Revised Code, in actions pending on the effective date of thisact, the interest rate provided for in section 1343.03 of the Revised Code prior to the amendment of that section by this act shall apply up to the effective date of this act, and the interest rate provided for in section 1343.03 of the Revised Code as amended by this act shall apply on and after that effective date." (Emphasis added.)
 {¶ 59} The judgment in this case was entered on June 6, 2005, a year after the effective date of the amendment to R.C. 1343.03. Therefore, the judgment as to a straight 10 percent interest calculation must be reversed and this case must be remanded for a calculation based on the foregoing. ZZZ's second assignment of error on its cross-appeal is well taken.
 {¶ 60} On consideration whereof, we find that substantial justice was done appellant and the judgment of the Erie County Court of Common Pleas is affirmed as to Counts 1, 2 and 3 of his complaint. Further, we find that substantial justice was not done appellee-cross appellant ZZZ Anesthesia, Inc. and the judgment of the Erie County Court of Common Pleas is reversed as to Count 6 of appellant's complaint as to interest only. The case is remanded for further proceedings consistent with this decision. Appellant and appellees are ordered, pursuant to App.R. 24, to pay the costs of this appeal in equal shares. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Erie County.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Pietrykowski, J., M. Parish, J., George M. Glasser, J.
Concur.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] At the end of 1996, the name of the corporation was changed from David. W. Deehr, D.O., Inc. to ZZZ Anesthesia, Inc. Within this opinion, all references to "ZZZ" include the corporation f.k.a. David. W. Deehr, D.O., Inc.